IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2012

## DEMETRIE OWENS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Marshall County**
**No. 2010-CR-40     Robert Crigler, Judge**

**No. M2011-02292-CCA-R3-PC -Filed October 5, 2012**

A Marshall County jury convicted the Petitioner, Demetrie Owens, of aggravated burglary and two counts of theft of property valued over $1000, and the trial court sentenced him as a Range II offender to an effective sentence of ten years in the Department of Correction. On appeal, this Court affirmed the Petitioner's convictions and sentence. *State v. Demetrie Darnell Owens*, No. M2009-02611-CCA-R3-CD, 2010 WL 3448138 (Tenn. Crim. App., at Nashville, Sept. 2, 2010), *no perm. app. filed*. The Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. On appeal, the Petitioner contends that he received the ineffective assistance of counsel because his trial counsel did not adequately cross-examine the State's witnesses and because he improperly "opened the door" to proof of a prior bad act by the Petitioner. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ. joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Demetrie Owens.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Lacy Wilber, Assistant Attorney General; Robert J. Carter, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Background
#### A. Trial

This cases arises out of a home invasion, which resulted in a Marshall County grand jury indictment against the Petitioner for one count of aggravated burglary and two counts of theft of property valued over $1000. In our opinion affirming the Petitioner's convictions and sentence, we summarized the evidence against the Petitioner as follows:

On May 2, 2008, Lewisburg veterinarian Dr. Randall Baker and his wife, Kathy Baker, discovered that their Marshall County home had been broken into and their home safe and its contents stolen. Because the breach of the home's security system had not resulted in a call from the couple's alarm company, the detective assigned to the case focused his initial attention on the couple's twenty-year-old daughter, Katherine Baker, who eventually confessed that she had suggested that the [Petitioner] rob her parents, provided him with the alarm system code, and left a bedroom window unlocked in order for him to gain entry into the home. Upon further investigation, the detective discovered that four days after the burglary the [Petitioner] had pawned a diamond ring that matched the description of one stolen from the home. As a result, the [Petitioner] was subsequently charged with one count of aggravated burglary and two counts of theft of property over $1000 and tried before a Marshall County jury.

At the [Petitioner]'s September 18, 2009, trial, Katherine Baker testified that she had pled guilty for her role in the crimes in exchange for a sentence of eleven months, twenty-nine days at thirty percent. She said that at the time of the burglary she was living rent-free with two roommates in a home owned by her father. Her parents had forbidden her from having parties at the house, but approximately one week before the burglary she defied their rules by hosting a party that was attended by a number of guests, including the [Petitioner]. While the party was in session, her parents stopped by the house, angrily confronted her in front of her guests about her disobedience, and ordered everyone, including her, off the premises. She and her friends left the house in three vehicles, with the [Petitioner], Jessica Young, Chris Jackson, and possibly Jeremy Davis sharing the same vehicle with her.

Baker, who explained that she was adopted, testified that her mother made her especially angry during their confrontation by expressing regret for having adopted her and that she suggested to her companions that they retaliate by robbing her parents. She said she "kind of got scared" after making the suggestion, but the [Petitioner] encouraged her by asking questions about her parents' possessions and home security system and talking about the money and jewelry they could get in the burglary. She, therefore, gave the [Petitioner]

-2-

the code to her parents' alarm system, told him that their money and jewelry were located in a safe in their bedroom closet, and discussed how he could get into the house through a window above the air conditioning unit. In addition, on the night before the burglary, she went to her parents' home and unlocked the window.

Baker testified that after she and the [Petitioner] were arrested, the [Petitioner] attempted to persuade her not to reveal his role in the crimes. She said the mother of the [Petitioner]'s children also contacted her numerous times in an attempt to influence her trial testimony. On cross-examination, she acknowledged that there were five or six people besides the [Petitioner] who heard her divulge her parents' security code and discuss plans for how to complete the burglary. She further acknowledged that, a few days after the burglary, Chris Jackson told her that there was nothing in the safe.

The State introduced by stipulation evidence that on May 6, 2008, the [Petitioner] pawned a man's horseshoe ring at Household Pawn Number 2 in Nashville. Jason Smith, an employee of the pawn shop, identified the ring, which was subsequently admitted as an exhibit, as a man's horseshoe gold ring with eleven, four-point diamonds and a weight of 6.9 DWT. On cross-examination, he estimated that horseshoe rings pass through the shop at the rate of one every month to two months, but said that, unlike the ring here, they were "usually not raised . . . with holes on the side" and did not weigh as much. In addition, the ring at issue in this case contained "two marks, one on each side of the base of the ring." He agreed, however, that were no identifying initials on the ring. He also conceded that the ring was the only item pawned by the [Petitioner] at the shop on that date.

Mrs. Kathy Baker testified that she arrived home from work on May 2, 2008, to find all the lights in and around the house lit, which indicated that the home's alarm had gone off. She said she initially thought it was a malfunction because nothing looked amiss and her husband informed her when she called him that he had heard nothing from their alarm company. Later that day, however, she went into her bedroom closet, discovered that the safe was missing, and called her husband and then the sheriff's department.

Mrs. Baker testified that when she attempted to reset her alarm at the request of the officers who responded to her house, a code came up indicating that a window was open. She said she and the officers then searched the house and discovered that a window in the spare bedroom located above the outside

central air conditioning unit was open. According to Mrs. Baker, the contents of the stolen safe, which had a total value of $6,550, included $300 in cash, papers, and an assortment of jewelry, among which was a man's horseshoe diamond ring and a woman's horseshoe diamond ring. When shown the man's horseshoe diamond ring pawned by the [Petitioner], Mrs. Baker identified it as the ring she had purchased as a first wedding anniversary gift for her husband, who was an equine veterinarian, testifying that she had chosen it with care, seen her husband wear it for the past thirty-one years, and had no doubt that it was her husband's ring.

Dr. Randall Baker testified that if a window was opened when his home's burglar alarm system was turned on, the alarm would go off, which immediately activated the system of house lights and, unless the alarm code was entered within thirty seconds, triggered a call to the security company. He said that he, his wife, and their daughter knew the code to his home's security system but that only he and his wife knew the combination to their fireproof safe, which he estimated weighed approximately seventy-five to eighty pounds. He stated that after the burglary he saw no indentations in the central air conditioning unit or in the pea gravel surrounding it, which indicated to him that more than one individual had been involved in removing the safe through the window. He said he did not know the [Petitioner] and did not give him or anyone else permission to enter his home or take his property.

Dr. Baker identified the horseshoe diamond ring pawned by the defendant as the ring his wife had given him on their first wedding anniversary, expressed his absolute certainty in his identification, and, at the request of the State, placed the ring on his finger to demonstrate that it fit. On cross-examination, he acknowledged that there were no initials or inscription on the ring but said that it had been specially sized to his finger because his hands were "a good bit smaller" than most men's hands.

Detective Bart Fagan of the Marshall County Sheriff's Office testified that he spoke to the victims' daughter on the day of the burglary after learning that she was the only person besides the victims who knew the home's alarm code. He said she initially denied any knowledge of the crimes but eventually gave a statement in which she mentioned both the [Petitioner] and Chris Young. As a result, he checked the pawn shops in Lewisburg and the surrounding counties, learned that the [Petitioner] had pawned a horseshoe ring on May 6, 2008, at Household Pawn Number 2 in Nashville, and took Mrs. Baker with him to the pawn shop, where she positively identified the

ring. He said he found no record of the [Petitioner]'s having pawned any items in any of the three pawn shops in Lewisburg and no record of Chris Jackson's having pawned any items. He stated that he searched for Chris Jackson but was unable to locate him.

On cross-examination, Detective Fagan testified that the [Petitioner] had pawned other jewelry at another pawn shop in Nashville, but those items were unrelated to this case. On redirect examination, he said the [Petitioner] sold a woman's horseshoe diamond ring at Jefferson Street Pawn and Jewelry, located two to three miles from Household Pawn Number 2, on May 9, 2008, but the ring was gone by the time he took Mrs. Baker to the shop to try to identify it. On recross examination, he testified that a pair of earrings that the [Petitioner] sold to the store at the same time did not belong to Mrs. Baker.

The [Petitioner], who was disruptive throughout the entire trial, refused to respond to the trial court or his counsel when they attempted to ascertain whether he wished to testify in his own behalf and was subsequently removed from the courtroom. After he refused several opportunities to return, the trial was continued in his absence with defense counsel resting without presenting any proof.

*State v. Demetrie Darnell Owens*, No. M2009-02611-CCA-R3-CD, 2010 WL 3448138, at *1-2 (Tenn. Crim. App., at Nashville, Sept. 2, 2010), *no perm. app. filed*. We affirmed the Petitioner's convictions and his sentence. *Id.* at *1.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief in which he alleged his trial counsel was ineffective. At the hearing on his petition, he testified that he was twenty-nine years old and currently incarcerated in the Tennessee Department of Correction, serving a ten-year sentence. The Petitioner said that his trial counsel ("Counsel") was appointed to represent him and represented him at both his preliminary hearing and also at his trial. The Petitioner identified a transcript of the preliminary hearing, saying that it accurately reflected what actually occurred during the hearing.

The Petitioner said that, during the preliminary hearing, Katherine Baker ("Baker"), the victims' daughter, testified to the effect that "somebody" told her after the burglary had occurred that they had everything from the safe. The Petitioner wanted this information fleshed out during the trial, and he told Counsel to pursue this line of questioning. The Petitioner said Counsel did not ask Baker about this, and the Petitioner addressed the trial

court about his concerns about his representation. He said Counsel was asking "useless questions" and was not doing what he "should have been doing." When asked what specific questions he wished Counsel had asked, the Petitioner responded:

I mean, it was too much really going on. I don't really just recall exactly, you know. It was just a lot of stuff going on that I felt like they should have did and a lot of questions that I feel like they should have asked.

The Petitioner went on to state that he took issue with the identification of Randall Baker's ring. He said they did not have "any proof that [the ring] was his ring," noting that the ring did not contain any initials or other identifying marks. He said that he wished Counsel had asked if the witnesses were "100 percent sure that that was their ring" because it was a "mass-produced" ring.

The Petitioner further testified that Counsel was ineffective for opening the door to the admissibility of information about his selling items at a second pawn shop. He pointed to a portion of the trial transcript during which Counsel was cross-examining Detective Fagan:

The question is asked, starting on line 7, by the defense: "And you said that you checked all of the pawnshops around here?"
Answer: "Yes, sir."
"You come up with the one ring that had [the Petitioner's] name attached to it. Is that right?"
Answer: "No, sir. I came up with more jewelry that was pawned at another pawnshop in Nashville, also with [the Petitioner's] name on it."
Question: "But those weren't related to this, were they?"
Answer: "No, sir."
"So out of those other items that were taken from this burglary, none of those other items were pawned?"
Answer: "Sir, I don't know if they were pawned. That is the only item that we recovered."
Question: "Okay. And that is the only item that had [the Petitioner's] name on it?"
Answer: "Yes, sir."
Question: "So based on your investigation, the only thing that [the Petitioner's] pawned was that ring?"
Answer: "Yes, sir, that I know of."

The Petitioner further noted that, during redirect, the detective testified that he went to other pawnshops after he discovered that the Petitioner pawned a man's ring at Household Pawn, and he learned the Petitioner pawned a female's 10-carat horseshoe ring at Jefferson Street pawnshop. The detective, he said, testified that he brought the victim, Katherine Baker ("Mrs. Baker"), to Jefferson Street pawnshop to attempt to identify the female ring, but the ring was no longer there.

The Petitioner noted that Detective Fagan's trial testimony differed from his testimony at the preliminary hearing. The Petitioner recalled that, at the preliminary hearing, the detective said that he took Mrs. Baker to two pawnshops and that, at one of the pawnshops, she identified her husband's ring. The detective went on to say that, at the other pawnshop, Mrs. Baker could not identify any of the items as belonging to her. Further, Mrs. Baker testified at the preliminary hearing that she looked at the ring at the second pawnshop and could not identify it. The Petitioner testified that, despite the fact that he informed Counsel of this inconsistency, Counsel did not cross-examine Detective Fagan about this issue.

The Petitioner testified that he wrote Counsel a letter in which he told Counsel that he was not happy with his representation and that he wanted to appeal his case pro se. Despite this, he never received notification from Counsel, or the public defender's office for whom Counsel worked, that he had withdrawn. The Petitioner also never received notice about his appeal from the Court of Criminal Appeals. The Petitioner said that the public defender's office filed an appellate brief in his case, appealing the sufficiency of the evidence and his sentence. The Petitioner said he also wanted to raise the issue of ineffective assistance of counsel and prosecutorial misconduct on his direct appeal. The Petitioner explained that he felt that the State committed misconduct by passing the pawn ticket to the jury.

During cross-examination, the Petitioner testified that he asked the trial court multiple times to have Counsel taken off his case. He agreed that, during the trial, he "acted out," the trial court "chasti[zed]" him, and he had to be removed from the trial. He agreed that he "may have" refused to participate at the sentencing hearing because he was "mad."

The Petitioner testified that Katherine Baker, the daughter of the victims, who testified at the preliminary hearing that she knew of "somebody" who had the items taken from the safe, was speaking about Chris Jackson. Specifically, Baker testified at the preliminary hearing that she saw Jackson a few days after the burglary, and Jackson told her that the safe was empty. The Petitioner conceded that Counsel asked Baker "a question or two" about Chris Jackson but complained that Counsel did not ask Baker a "whole lot" of questions about Jackson. The Petitioner testified that "it was [his] understanding" that Chris Jackson told Baker that he had "everything" from the safe and that Counsel should have pursued this

line of questioning. The Petitioner said that he thought that Baker had said this in a statement but he was unsure.

The Petitioner agreed that the State presented two witnesses who identified the ring that the Petitioner had pawned and that the State alleged belonged to Mr. Baker. Both witnesses said that Mrs. Baker had purchased it for Mr. Baker as an anniversary present, and Mrs. Baker said she had seen Mr. Baker wear the ring for a number of years. The man at the pawnshop testified that the ring was very unusual and unique in that it was heavier than most rings, had a different setting of the diamonds, and had two marks. The Petitioner agreed that Counsel asked the witnesses whether there were any initials on the ring. The Petitioner said he wanted Counsel to "prove" that the ring did not belong to the Bakers. When asked by the State how the Petitioner wanted Counsel to "prove" this, the Petitioner said he "just feel like [Counsel] didn't do what [he] was supposed to do."

The State then asked the Petitioner about the evidence from the second pawnshop. The State informed the Petitioner that the pawnshop operator from the second pawnshop had identified the Petitioner in a photographic lineup as the man who signed the pawnshop ticket, pawning the woman's ring. The State said Counsel was aware of this witness. The Petitioner said that he believed the ticket from pawning the woman's ring should not have been presented to the jury because it did not have anything to do with the charges for which he was on trial.

The Petitioner acknowledged that other items of jewelry were pawned at the time the woman's ring was pawned. He denied that Detective Fagan's testimony, at trial and the preliminary hearing, was that the woman's ring was "sold" rather than pawned and that, as such, the ring was no longer there when he brought Mrs. Baker to the second pawnshop. He further denied that the detective said that Mrs. Baker could not identify the other items of jewelry that were at the pawnshop.

The Petitioner maintained that he had the receipt of the letter he sent to Counsel but said that he forgot to bring the receipt to the hearing. The Petitioner said that he did not know what additional issues he would have raised in his appeal but said he wanted to pursue the appeal pro se. The State then presented the Petitioner a copy of the letter that he had written, and the Petitioner identified the date on the letter as November 23, 2009.

Counsel testified that he was appointed as a public defender to represent the Petitioner and that another attorney from the public defender's office assisted him as co-counsel ("Co-Counsel"). Counsel recalled the issue surrounding Chris Jackson, saying that the victims' daughter testified that Jackson made an admission to her about the burglary. Counsel said that he covered that issue "the best [he] could." Counsel agreed that there was a "fairly good

amount" of testimony about Jackson. At trial, Counsel attempted to place the blame for the burglary on Jackson.

Counsel recalled that the Petitioner did not seem to understand the circumstantial evidence against him and took issue with the fact that one horseshoe ring would tie him to the burglary. Counsel said he explained to the Petitioner the presumption that recently stolen property is presumed to be stolen by the person who possessed it. The Petitioner, however, did not seem to understand.

Counsel testified that Co-Counsel cross-examined Mr. Baker about the fact that there were not personalized marks on the ring that he identified as belonging to him. He said, however, that there were in fact things about the ring that made it more unusual than most horseshoe rings and that the pawnshop owner testified that he had not seen a ring like that before. Counsel said he felt that he and Co-Counsel did all that they could do to challenge the witnesses identification of the ring.

Counsel said he was aware before trial, through discovery, that the Petitioner had pawned other items of jewelry, including a lady's horseshoe ring, at a second pawnshop. He said he was aware that the pawnshop operator from the second pawnshop had identified the Petitioner from a photographic lineup as the man who had pawned the jewelry. Counsel agreed that the testimony from the trial and the preliminary hearing was that the lady's ring was sold before Mrs. Baker could go to the pawnshop and identify it. Further, he agreed that Mrs. Baker could not identify any of the other items of jewelry as belonging to her. Counsel said that, when he objected to the State's admission of the pawnshop ticket from the second pawnshop, the State threatened to call the pawnshop operator to identify the Petitioner as the man who had pawned the items. Counsel, therefore, withdrew his objection.

Counsel testified that the Petitioner wrote him a letter saying that he wanted to represent himself. He said, however, he received this letter either November 25 or November 26, after the Petitioners' motion for new trial on November 11. In an "abundance of caution," he went ahead and filed the appeal so the Petitioner would not lose that right. Counsel said that, after he filed the appeal, he corresponded with the Petitioner, sending him different items/documents that he requested, and the Petitioner never said again that he wanted to represent himself.

During cross-examination, Counsel testified that he was aware of the allegation that he opened the door to evidence about the second pawnshop being admitted. He said, however, that the information from the second pawnshop was that the Petitioner had pawned a lady's horseshoe ring. Counsel did not think this information was that damaging to the Petitioner because horseshoe rings are very common. Counsel said that the other information

about the second pawnshop helped the Petitioner because Mrs. Baker said that none of those items belonged to the Bakers and that they were not from her house. Counsel said he brought out, at trial, that it was speculation on the State's part that the lady's ring that the Petitioner pawned was the same ring stolen from Mrs. Baker.

Counsel acknowledged that there was ample time for the Petitioner to represent himself and said that he was not trying to deny the Petitioner that right. He said, however, that because the Petitioner never mentioned it again, he did not think this was the Petitioner's desire.

Counsel testified that the statement the victim's daughter made about Chris Jackson was as follows: "The time back in April, when Chris and Mimi were at the house, they got me stirred up about my parents and made me mad. I have seen Chris since the burglary, and he said there was nothing in the safe."

Before ruling, the post-conviction court made the following "observations":

As to the cross-examination of what I will call the daughter, I recall the defense did a good job about trying to, as [Counsel] testified, [p]ut the blame on Chris Jackson. I thought, my recollection, was going pretty good for the defense at that point. I thought they did a good job on that.

I think the [Petitioner] is putting too much emphasis on some hypertechnical discrepancy that he claims that really misses the point. I think they did a good job crossing, trying to place the blame on Chris Jackson.

And the ID of the ring, the reason – there are a couple – two reasons I overruled the State's objection.

One is the appellate court decided sufficiency of the evidence, which is not the same thing as effective assistance of counsel.

And then I also just wanted to give [the post-conviction attorney] a chance to develop his proof.

At any rate, that is not – as far as the merits of it go, the ring was positively ID'd, because of its unique characteristics. And the cross was as good as it could be, to point out the commonality between it. The defense did anything any defense lawyer could do to show that it was not unique, but it just so happened, they were stuck with the evidence – the evidence is the evidence.

You can only do so much with it. They did everything they could on cross on that. I specifically remember that.

The appeal is a nonissue to me because, if nothing else, the defense hasn't shown any prejudice or detriment from the Public Defender's office pursuing his appeal.

The only possible thing that he said that – the only other issue he could even come up with was some kind of prosecutorial misconduct by bringing up the Jefferson Street pawn, and that is – there is no issue there. There is no merit to that issue, so that wouldn't have mattered anyway.

Probably the most meritorious issue would be the issue about this other stuff at the Jefferson Street pawn. My recollection – and there certainly is no prosecutorial misconduct on that because my recollection is, is the defense was making a pretty good point, and I thought was leading the jury to believe somebody else pawned this stuff, but it was misleading.

As it turned out, that would have been misleading the jury because, as it turned out, the evidence was the [Petitioner] was, in fact, the one that pawned this stuff.

The jury, you can't just assume that the jury assumed it was the same property. It was like my analogy about identification. Just because one witness says, I am not sure if that was him that did it, but it looked like him, it doesn't mean that witness doesn't get to testify. That proof may not be, standing alone, enough to sustain a conviction, but it is still relevant evidence, even though it is not a positive ID.

I think maybe that effort by the defense didn't work out as well as they thought it would. But we all know that trial tactics, if they don't work out as well as you think they would, that is not a basis to grant a post conviction.

The post-conviction court issued a written order in which it dismissed the Petitioner's petition for post-conviction relief. It is from that order that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred when it dismissed his petition because Counsel was ineffective. He contends Counsel was ineffective for failing

to adequately cross examine the victims' daughter, Katherine Baker, and also Detective Fagan. He further contends Counsel was ineffective for "opening the door" to evidence about the Petitioner pawning a lady's horseshoe ring at a second pawnshop. The State responds that the Petitioner has failed to prove that Counsel was deficient or that Counsel's performance prejudiced the Petitioner. The State further contends that the Petitioner failed to prove any of the claims raised by his petition.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn.2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Harris v. State*, 875 S.W.2d 662, 665 (Tenn.1994).

## A. Cross-examination

The Petitioner contends that Counsel was ineffective for failing to adequately cross-examine the victims' daughter, Katherine Baker, and also Detective Fagan. The Petitioner asserts that, based upon the preliminary hearing testimony, Counsel should have developed proof that Baker said that someone other than the Petitioner had the items inside the safe. Further, the Petitioner contends that Counsel should have further developed that the detective said at the preliminary hearing that Mrs. Baker was unable to identify the ring at the second pawn shop. The State counters that Counsel did, in fact, ask Baker about her testimony at the preliminary hearing and that Counsel adequately cross-examined Detective Fagan.

In its written order, the post-conviction court found:

> First, the [Petitioner] argues that his [C]ounsel failed to adequately cross [Katherine] Baker about statements accomplice, Chris Jackson, made to her. However, the transcript shows that [C]ounsel got her to concede that a few days after the burglary Jackson told her there was nothing in the safe. . . . At page 57, he asked her if at the preliminary hearing she testified that Jackson told her he had everything in the safe and [she] said she didn't remember. Pages 43-45 show he crossed her on differences between her direct trial testimony about when the burglary was planned, where it was planned and differences in describing the degree of participation in the conversation by Chris Jackson. The [Petitioner] fails to recognize that Chris Jackson's involvement does not necessarily absolve the [Petitioner] of guilt as oftentimes two or more individuals unite to commit a crime.
>
> . . . .
>
> The preliminary hearing transcript, exhibit two, shows that Detective Fagan found three items pawned by the [Petitioner] after checking his name. One of these items was the man's horseshoe ring pawned at Household Pawn. He testified that the other two items were not involved or not identified . . . . He testified at page 13 that Mrs. Baker could not identify either of these two items. At trial he testified that the [Petitioner] sold (not pawned) a ladies horseshoe ring at Jefferson Street and that pawn shop had sold that ring before he came with Mrs. Baker to see if she could identify it. There is no inconsistency between Detective Fagan's preliminary hearing testimony and trial testimony. There were two pawn shops and four items mentioned[.] At Jefferson Street, Mrs. Baker could not identify two items the [Petitioner] pawned, she was unable to look at the ladies' horseshoe ring because the pawn

-14-

shop sold it. The fourth item was the men's horseshoe ring the [Petitioner] pawned at Household Pawn that was positively identified.

We have reviewed the trial transcript and also the transcript of the preliminary hearing, and we conclude the evidence does not preponderate against the post-conviction court's findings. The evidence shows that Counsel adequately cross-examined both Katherine Baker and Detective Fagan. Counsel specifically asked Baker during the trial whether she "recall[ed] testifying at the preliminary hearing that . . . Chris Jackson told [her] that he had everything in the safe." Baker responded that she did not remember if she had so testified. Further, we agree with the trial court that Detective Fagan's testimony during the preliminary hearing was not inconsistent with his trial testimony. The Petitioner is not entitled to relief on this issue.

### B. Testimony About Second Pawnshop

The Petitioner next contends that Counsel was ineffective for "opening the door" to evidence about the Petitioner pawning a lady's horseshoe ring at a second pawnshop. He asserts that there was no "legitimate tactical reason" for Counsel to pursue this line of questioning, "which resulted in the State being allowed to introduce speculative and highly prejudicial proof." The post-conviction court found:

> [C]ounsel's trial contention was that someone other than the [Petitioner] entered and stole the jewelry from the Baker's home. To this end [C]ounsel tried to suggest that someone other than the [Petitioner] had pawned other stolen items. [C]ounsel tried to emphasize the point that the man's horseshoe ring was the only jewelry positively identified as having been pawned by the [Petitioner] in cross of Detective Fagan. This led to Detective Fagan's testimony that he discovered that the [Petitioner] had pawned other jewelry unrelated to this case at a Jefferson Street pawn shop. On redirect, the state elicited testimony that while neither Mr. nor Mrs. Baker identified any such property, one item pawned by the [Petitioner] at the Jefferson Street pawn shop was a ladies' diamond horseshoe ring and such a ring was reported stolen in the burglary. It is sheer speculation to guess whether this testimony helped or hurt the [Petitioner]. It did however result from a sound trial theory of defense that being that someone other than the [Petitioner] entered Mr. and Mrs. Baker's home and stole the safe and jewelry.

We conclude the post-conviction court did not err when it concluded that Counsel was not ineffective in this regard. Counsel's trial strategy was based upon showing that someone other than the Petitioner had pawned the man's ring. When Counsel was eliciting testimony

on this issue, Detective Fagan testified about the Petitioner pawning items at a second pawn shop. Counsel was aware of the items pawned at the second pawn shop but said he did not think this testimony would hurt the Petitioner because Mrs. Baker said that none of the pawned items belonged to her. The Petitioner has not proven that "there is a reasonable probability that," but for Counsel's opening the door to this line of questioning, "the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Therefore, the Petitioner has not proven that Counsel's performance prejudiced him. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the post-conviction court did not err when it dismissed the Petitioner's post-conviction petition. We, therefore, affirm the post-conviction court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE